# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

NOEL ABBOUD,

                **Plaintiff,**

        v.

**COUNTY OF ONONDAGA, NEW
YORK et al.,**

                **Defendants.**

5:14-cv-193
(GLS/ATB)

_____

**APPEARANCES:**

**FOR THE PLAINTIFF:**
Bosman Law Firm, LLC
201 West Court Street
Rome, NY 13440

**FOR THE DEFENDANTS:**
Onondaga County Attorney's Office
John H. Mulroy Civic Center
421 Montgomery Street, 10th Floor
Syracuse, NY 13202

Onondaga County Department of Law
John H. Mulroy Civic Center
421 Montgomery Street, 10th Floor
Syracuse, NY 13202

**OF COUNSEL:**

AJ BOSMAN, ESQ.

KAREN ANN BLESKOSKI, ESQ.

RONNIE WHITE, JR., ESQ.

**Gary L. Sharpe
Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff Noel Abboud brings this action under Title VII of the Civil Rights Act of 1964,[1] 42 U.S.C. §§ 1981, 1983, 1985, and 1986 based on violations of the First and Fourteenth Amendments, New York State law, and the state constitution against the County of Onondaga (hereinafter "the County") and various employees[2] within the Onondaga County Department of Correction (hereinafter "the Department"). (Am. Compl., Dkt. No. 25.) Pending is defendants' motion for summary judgment. (Dkt. No. 68.) For the following reasons, the motion is granted in part and denied in part.

## II. Background

### A. Facts[3]

#### 1. The Parties

Abboud was born in Syracuse, New York. (Dkt. No. 68, Attach. 19

---

[1] *See* 42 U.S.C. §§ 2000e-2000e-17.

[2] The individual defendants are Timothy Cowin, Daniel Boyle, Randy Blume, William Brush, Thomas Tripoli, Nathan Hawker, Robert Burnett, Kathleen Zabinski, Troy Pritchard, Gerald Riposa, Adam Brockway, and John and Jane Doe(s).

[3] Unless otherwise noted, the facts are undisputed.

2

at 18-19.)  His parents are from Lebanon, and he has dual-citizenship. (*Id.* at 19.)  In 2002, he was hired by the County as a corrections officer and, on September 24, 2011, he became a senior corrections officer at the Jamesville Correctional facility.  (*Id.* at 22; Defs.' Statement of Material Facts (SMF) ¶ 114, Dkt. No. 68, Attach. 95; Dkt. No. 75, Attach. 12 ¶ 5.) He claims that "[t]he majority of employees working at the Jamesville Correctional facility are [w]hite" and he is "the only employee of Arab ancestry."  (Dkt. No. 75, Attach. 12 ¶ 6.)

The County maintains policies and procedures addressing harassment, discrimination, and retaliation, which are outlined in the employee handbook that is provided to every County employee.  (Defs.' SMF ¶ 39.)  Additionally, Department employees are issued an employee manual containing directives regarding harassment, discrimination, and retaliation.  (*Id.* ¶¶ 44-45.)  County employees also receive diversity training, (*id.* ¶ 50), and Department employees attend additional annual training, which covers harassment and discrimination, (*id.* ¶ 51).

The remaining defendants (hereinafter "Jamesville defendants") consist of one or more John and Jane Doe(s) and eleven Department employees who, at all relevant times, held the following positions at the

Jamesville Correctional Facility: defendant Timothy Cowin was the Commissioner, (*id.* ¶ 3), defendants Daniel Boyle and Randy Blume were Assistant Commissioners, (*id.* ¶¶ 6-7), defendants William Brush and Thomas Tripoli were Captains, (*id.* ¶¶ 19, 23), defendants Nathan Hawker and Robert Burnett were Lieutenants, (*id.* ¶¶ 8, 28), defendant Kathleen Zabinski was a Sergeant, (*id.* ¶15), and defendants Troy Pritchard, Gerald Riposa, and Adam Brockway were Corrections Officers (CO), (*id.* ¶¶ 25, 27, 30).[4]

The Personnel Advisory Committee (PAC), which is comprised of the Assistant Commissioners, the Captains, and a Personnel Administrator, reviews reports of incidents involving employees and makes disciplinary recommendations to the Commissioner. (*Id.* ¶ 54.) Based on these recommendations, the Commissioner ultimately determines the appropriate discipline to be issued, if any. (*Id.* ¶¶ 56, 59.)

2.    *Abboud's Claims*

Abboud claims that he has faced unfair treatment based on his Arab

---

[4] The Department is a paramilitary organization with a chain of command, from highest to lowest, as follows: Commissioner, Assistant Commissioner, Captain, Lieutenant, Sergeant, and CO. (Defs.' SMF ¶ 42.)

ethnicity[5] since 2007.  (Dkt. No. 68, Attach. 19 at 56.)  In support of his

claims, he describes defendants' alleged harassment, discrimination, and

retaliation in his deposition testimony, (Dkt. No. 68, Attach. 19), and an

affidavit attached to his response to defendants' motion for summary

judgment, (Dkt. No. 75, Attach. 12).[6]

---

[5] Heretofore, the parties have used various terms to describe the trait upon which Abboud bases his claims on, including "ethnicity," "national origin," "ancestry," and "race."  For instance, several causes of action are based solely on "national origin" discrimination.  (Am. Compl. ¶¶ 43-45, 46-48, 49-52, 56-58, 73-75.)  Although neither party discusses it, it is worth noting that Abboud was born in the United States, (Dkt. No. 75, Attach. 12 ¶ 3), and there is clearly no evidence that Abboud was discriminated against because he is American.  Nonetheless, Abboud's claims are properly construed as alleging discrimination based on his Arab ancestry, ethnicity, or race.  *See, e.g.*, *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) ("Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics."); *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973) (holding, in the Title VII context, "[t]he term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came") (footnote omitted).  Because the parties treat these terms as a difference without distinction, the court does the same.  *See Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) ("Courts have also recognized that race and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of a case" and collecting cases).

[6] The court considers the facts alleged throughout these filings in the interest of justice, despite Abboud's failure to "set forth any additional material facts that [he] contends are in dispute in separately numbered paragraphs, followed by a specific citation to the record where the fact is established." N.D.N.Y. L.R. 7.1(a)(3); *see Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."). In many instances, the court has gone out of its way to scour the voluminous record to track down Abboud's ambiguous cites.  *See Prive v. Johnson*, No. 5:04–CV–1024, 2010 WL 3338810, at *2 & n.2 (N.D.N.Y. Aug. 23, 2010) (finding that the court is not obligated to scour the record for evidence of material questions of fact).  For example, throughout Abboud's response to defendants' statement of material facts, he cites to his own affirmation generally, without bothering to point out which of the sixty-six paragraphs in that affirmation actually support his responses.  (*See generally* Dkt. No. 75, Attach. 13.) Further, in several other instances, Abboud fails to specifically controvert the assertions contained within defendants' statement of material facts with record evidence, in admissible form.  (*See, e.g., id.* ¶¶ 93-94, 135, 167, 206.)  The court deems such facts admitted.  As the court has previously observed of plaintiff's counsel, "failing to abide by basic rules is sloppy practice and wastes the court's time."  *Perez v. County of Rensselaer, New York*, 1:14-cv-950, 2018 WL 3420014, at *2 n.9 (N.D.N.Y. July 13, 2018). Defendants should also pay heed, as they do not include a single cite to their statement of material facts in their motion papers.  Implicit within the rule requiring parties to "set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue" is the expectation that they will actually cite to these paragraphs in their motion papers.  Failure to do so provides a basis to deny the moving party's motion in its entirety.  In the interest of justice, the court

### a. Incidents Lacking Specificity

First, many of Abboud's allegations fail to state when they occurred or who was responsible for them. For instance, he alleges that an unidentified employee called him "ISIS" about a year and a half before his deposition, and that individual was subsequently disciplined after an investigation. (Dkt. No. 68, Attach. 19 at 107.) In or around 2007, he claims that a group of unidentified officers called him a "camel jockey." (*Id.* at 46.) Abboud also claims that on unidentified dates, "many officers" stated "go back home . . . [t]owel head," made disparaging comments regarding him and "a barrel of oil," and directed other officers not to talk to him. (*Id.* at 56-57.) Abboud further alleges that he was subjected to the following comments from unidentified individuals on unidentified dates: "get back on your [c]amel and go back to your country" and "don't you own a 7-Eleven store[?]" (Dkt. No. 75, Attach. 12 ¶ 7.) Other conduct that Abboud did not attribute to any particular individual occurred in "2010 or 2011," when a drawing was "posted in the facility's cafeteria depicting [another CO] wearing a turban in a background filled with sand . . .

---

declines to do so. However, both parties are hereby put on notice that the court may not be so lenient in the future if they continue to flout the Local Rules.

teaching a crowd how to make bombs."  (Dkt. No. 75, Attach. 12 ¶ 8.)  On

another unidentified date, Abboud alleges that CO Riposa told him that he

supported Hitler's ideas and referred to Abboud as "Saddam Hussein's

son."  (*Id.* ¶ 42.)  He alleges that "on a daily or near daily basis, co-

workers and officers of rank have made demeaning comments to [him]

about the style of [his] civilian clothing, the rap music [he] listen[s] to, and

the customizations to the vehicle [he] own[s]."  (*Id.* ¶ 9.)  And he further

alleges that unidentified co-workers and supervisors have commented that

he "look[s] like an inmate."  (*Id.*)  He also alleges that, on an unknown

date and time, Captain Brush called him "a fucking Arab," "terrorist," and

blamed him for 9/11.  (Dkt. No. 68, Attach. 19 at 45.)  Sometime prior to

August 2011, Abboud claims to have witnessed Captain Brush, Sergeant

Zabinski, and other officers either make ethnically disparaging comments

to another officer of Arab ancestry or fail to admonish individuals making

such statements.  (Dkt. No. 75, Attach. 12 ¶ 10.)  Additionally, he claims

he was not selected for various interviews for positions that have all gone

to white people.  (Dkt. No. 68, Attach. 19 at 100-02.)

On an unidentified date, Abboud alleges that Lieutenant Hawker

took him off "[S]upport [C]lub" and he was denied positions on the

Response Team[7]. (*Id.* at 63, 73, 127.) Specifically, Abboud claims that Lieutenant Hawker consistently assigned CO Riposa, who was neither a Senior CO nor a Response Team member, to Security Support and Unit Support Officer positions, while he assigned Abboud to the Housing Units, despite the fact that "[h]istorically, the Security Support and Unit Support Officer positions are given to Senior [COs] and Response Team members." (Dkt. No. 75, Attach. 12 ¶ 43.)

Other of Abboud's sworn statements are more specific, but difficult to reconcile. For instance, at one point in his deposition, he testified that CO Riposa, Lieutenant Hawker, and Captain Brush were the only people who made disparaging remarks in his presence. (Dkt. No. 68, Attach. 19 at 144.) But he also testified that, on an unspecified date and time, CO Brockway made a comment about the rims on his car, which he took as an implication that he sold drugs, (*id.* at 151), and, in his affirmation, he alleged that CO Brockway stated that "[f]oreigners don't belong in this country," (Dkt. No. 75, Attach. 12 ¶ 36). Strangely, Abboud also testified during his deposition, "I get along with everyone [at the facility] and

---

[7] According to Abboud, the "Response Team" is "a designated special unit of personnel specialized in unusual and extreme situations that the facility may encounter." (Dkt. No. 68, Attach. 6 at 7.) Accordingly, Response Team members "receive extra training with weapons, chemical agents, and equipment that ensure safety and compliance within the facility." (*Id.*)

everyone pretty much gets along with me." (Dkt. No. 68, Attach. 19 at 59.)  When asked about what evidence he had that the Jamesville defendants conspired with each other, he merely speculated that all of the Jamesville defendants are friends.  (*Id.* at 157-59.)

> b.    *2010-2011*

The first instances of conduct attributable to any of the Jamesville defendants on a specific date begin in 2010.  On April 19, 2010, Abboud alleges that COs, including Riposa, called him a "[s]tone thrower," and said "I d[id]n't think . . . you people wore shorts."  (Dkt. No. 75, Attach. 12 ¶ 14.)  Although, in his original deposition, he did not specify CO Riposa as one of the officers making such statements and could not recall when these comments were made, (Dkt. No. 68, Attach. 19 at 46-47), his testimony was consistent that, after hearing these comments, he complained to Lieutenant Burnett and Captain Tripoli but would not provide the names of the COs involved.  (Dkt. No. 68, Attach. 19 at 46-47; Attach. 40; Dkt. No. 75, Attach. 12 ¶¶ 14, 16.)  The next day during roll call, Lieutenant Burnett directed officers not to make these types of

remarks.[8]  (Dkt. No. 75, Attach. 12 ¶ 14; Def.'s SMF ¶¶ 87-88.)  Abboud admits that the discriminatory comments stopped after this or "if there was a reoccurrence[,] he would indicate that he did not like it, and it would stop."  (Def.'s SMF ¶ 90.)

The same day that Abboud complained about these alleged comments, he was issued a written reprimand, per PAC's recommendation, based on a March 8, 2010 violation of visitation room policy.  (*Id.* ¶¶ 81-84; Dkt. No. 75, Attach. 12 ¶ 15.)

On September 23, 2010, while being interviewed by a member of Internal Affairs regarding complaints about his interactions with inmates during visitation, Abboud "became visibly upset and began crying."  (Defs.' SMF ¶ 91.)  On September 29, 2010, Abboud alleges that he was "criticized by Lieutenant Burnett for allegedly 'pacing' in the visitation room" and told that his job performance was "not good."  (Dkt. No. 75, Attach. 12 ¶ 20.)  He told Lieutenant Burnett that he felt like he was being discriminated against, and Lieutenant Burnett responded by telling him to fill out a harassment form if he felt that way.  (*Id.*)

---

[8] Although Abboud admits that officers were reprimanded at roll call, initially at his deposition, Abboud denied that anything was said at roll call.  (Dkt. No. 68, Attach. 19 at 48.)

On October 1, 2010, Abboud alleges that he notified a County Personnel Officer about the harassment and discrimination that he allegedly experienced.  (*Id.* ¶ 21.)  On October 6, 2010, Assistant Commissioner Blume met with Abboud to discuss issues that might compromise his ability to perform his duties, based on his September 23, 2010 interview, and discussed that the employee assistance program might be useful.  (Defs.' SMF ¶¶ 78, 92.)  On October 24, 2010, Lieutenant Burnett allegedly called him a "shit magnet."  (Dkt. No. 75, Attach. 12 ¶ 23.)

On November 4, 2010, while Abboud was outside the facility smoking a cigarette, he alleges that Captain Brush commented, in sum and substance, that it would not be so expensive to live in New York City "if it wasn't for you fucking Arabs blowing up shit down there."  (Dkt. No. 68, Attach. 19 at 48-49; Dkt. No. 75, Attach. 12 ¶ 25.)

       *c.*    *2011-2012*

On January 5, 2011, Abboud allowed a visitor involved in an incident to leave without contacting his immediate supervisor as directed.  (Defs.' SMF ¶ 93 (citing Dkt. No. 68, Attach. 60).)  Thereafter, PAC recommended that Abboud receive an oral warning for neglect of job

duties based on the incident, which Lieutenant Brush issued to him on January 26, 2011.  (Dkt. No. 75, Attach. 12 ¶ 26. (citing Dkt. No. 68, Attach. 21 at 5); Defs.' SMF ¶ 94.)

On February 16, 2011, Brush received a complaint from a visitor that Abboud had made rude comments to her.  (Defs.' SMF ¶ 95.)  On February 22, 2011, Zabinski received a complaint from an inmate that Abboud had acted inappropriately towards one of his visitors.  (*Id.* ¶ 96.) On February 23, 2011, Abboud was notified that he was being transferred from visitation duty and reassigned to splitting his time between two shifts, allegedly to "address the repeated issues that had arisen while [he] was assigned to visitation."  (*Id.* ¶ 98; Dkt. No. 75, Attach. 12 ¶¶ 28-29.)  After an investigation of the complaints made against Abboud, PAC recommended that he receive a written reprimand, which was given to him on March 29, 2011 by Lieutenant Burnett.  (Defs.' SMF ¶ 97; Dkt. No. 75, Attach. 12 ¶ 32 (citing Dkt. No. 68, Attach. 42 at 20-24).)

On March 8, 2011, Abboud detailed the above-mentioned conduct that he perceived to be unfair treatment in an "Onondaga County Employee Harassment and Discrimination Complaint Form," (Dkt. No. 68, Attach. 21), and a complaint to Commissioner Cowin, (*id.* at 4-7).  The

matter was referred to Internal Affairs for investigation. (Def.'s SMF ¶ 101.) Later that month, Abboud provided more details concerning the examples outlined in the complaint to Internal Affairs. (*Id.* ¶ 102; Dkt. No. 75, Attach. 12 ¶ 31.)

### d.    2012-2013

On October 27, 2012, CO Pritchard claims that an inmate accused Abboud of providing him drugs. (Dkt. No. 68, Attach. 36 at 37-38.) CO Pritchard immediately alerted Lieutenant Brush and CO Brockway. (Defs.' SMF ¶ 118.) Thereafter, Lieutenant Brush alerted Captain Tripoli, and the Onondaga County Sheriff's Office was called to investigate. (*Id.* ¶¶ 128-129.) Captain Tripoli later informed Assistant Commissioner Blume about the situation, (*id.* ¶ 130), who, in turn, contacted Commissioner Cowin to discuss whether Abboud should remain on duty during the investigation. (*Id.* ¶ 131.) Commissioner Cowin determined that Abboud should be taken off duty, so he directed Assistant Commissioner Blume to direct Captain Brush to have Abboud escorted off the premises. (*Id.* ¶¶ 131-132; Dkt. No. 75, Attach. 12 ¶¶ 33-34A.)[9] Abboud was escorted off the

---

[9] Abboud numbered duplicate paragraphs as "34" and "35." (Dkt. No. 75, Attach. 12 at 9.) For clarity, the court refers to the first paragraphs as "A" and the subsequent paragraphs as "B."

premises and placed on administrative leave.  (Defs.' SMF ¶ 133.)

Abboud was paid for his time off and not subjected to discipline.  (*Id.*

¶ 135.)[10]  When Abboud arrived home that day, he received a call from

Captain Brush, who told him to return to work on his next regularly-

scheduled shift.  (*Id.* ¶ 139; Dkt. No. 75, Attach. 12 ¶ 34B.)  The Sheriff's

investigation revealed that the inmate in question later identified a

different CO as the individual who provided him contraband and was not

credible.  (Defs.' SMF ¶ 141.)

On November 3, 2012, Aboud filed another "Onondaga County

Employee Harassment and Discrimination Complaint Form" for

discrimination and harassment; however, he did not check the box for

"national origin" or "race," but rather "other," which he did not describe

further.  (Dkt. No. 75, Attach. 12 ¶ 35B (citing Dkt. No. 68, Attach. 76).)

On December 15, 2012, Abboud received another written reprimand

for an absence.  (Dkt. No. 75, Attach. 12 ¶ 38 (citing Dkt. No. 68, Attach.

78 at 2-6.)  Specifically, Abboud failed to provide a written verification from

his medical provider to support his claim that he was sick on November 6,

---

[10] Abboud purports to deny this fact, but provides no evidence to support his assertion.  (Dkt. No. 75, Attach. 13 ¶ 135.)  Thus, it is deemed admitted.

2012.  (Defs.' SMF ¶ 151.)  Accordingly, PAC recommended Abboud receive a written reprimand and that his pay be docked for the absence.  (*Id.*)  After Abboud filed a grievance, the written reprimand was reduced to an oral warning.  (*Id.* ¶ 152.)

       *e.*    *2013-2014*

Abboud affirms that on March 5, 2013 a non-party Sergeant made a comment referring to his "drug sales going up."  (Dkt. No. 75, Attach. 12 ¶ 40.)  He claims that Lieutenant Hawker tacitly supported this statement by laughing.  (*Id.*)  On March 21, 2013, Abboud alleges that "[CO] Riposa stated that he did not want minorities to progress" and that Lieutenant Hawker tacitly supported this statement by responding, "Yeah[,] I couldn't believe that he got promoted, that they would promote him."[11]  (*Id.* ¶ 41.)  After an internal investigation into CO Riposa's alleged comments, PAC issued him an oral warning and ordered him to attend diversity training.  (Defs.' SMF ¶ 187.)  Thereafter, Abboud alleges that CO Riposa told other officers not to speak to him.  (Dkt. No. 75, Attach. 12 ¶ 51.)  After another investigation, PAC recommended coaching.  (Defs.' SMF ¶¶ 243.)

---

[11] Abboud's assertion that Hawker stated, "I don't know who Allah is, but I'm pretty sure I sent them all there to meet him" is just one example of inadmissable hearsay relied on by Abboud but not considered by the court.  (Dkt. No. 75, Attach. 12 ¶¶ 29, 32, 33, 36, 42.)

On March 26, 2013, Abboud complained to Lieutenant Hawker upon noticing that he was the only member of the Response Team on his shift not on the list to be firearms qualified. (Dkt. No. 75, Attach. 12 ¶ 44.) As a result of being omitted from this list, Abboud alleges that he was "denied assignments and deprived of overtime opportunities." (*Id.* ¶ 46.) Although being firearms qualified does not affect an officer's ability to earn overtime, (Defs.' SMF ¶ 167[12]), it is undisputed that such an omission precluded him from certain assignments, (Dkt. No. 75, Attach. 12 ¶ 46).

On April 4, 2013, Hawker advised Abboud that he was not in compliance with the shaving policy. (Defs.' SMF ¶¶ 160, 184.) Initially, Lieutenant Hawker ordered him to write a report about why he did not shave and then asked him to rewrite it after he submitted it. (Dkt. No. 75, Attach. 12 ¶ 48.) Ultimately, PAC recommended that coaching was the appropriate remedy for the violation. (Defs.' SMF ¶ 161.)

Abboud was aware of the Department policy that employees be clean shaven at all times in order to ensure that face masks could be fitted properly. (Defs.' SMF ¶¶ 175, 177.) However, Abboud was exempted

---

[12] Abboud purports to deny this fact but offers no clear citation to the record that supports his position. (Dkt. No. 75, Attach. 13 at 49.) Thus, it is deemed admitted.

from face mask fitting because he had a medical note indicating that he could not shave everyday. (Dkt. No. 68, Attach. 19 at 74.) Abboud's exemption from being fitted for a face mask did not mean that he was not required to shave in general. (*Id.* ¶ 184.) Nonetheless, Abboud felt that it was unfair that he was prohibited from face mask fitting because of his facial hair, despite having a medical note addressing his shaving restrictions. (Dkt. No. 68, Attach. 19 at 74.) He alleges that other employees who chewed tobacco, which was also a violation of protocol, were not disciplined and that another employee with facial hair was allowed to be fitted for a face mask. (Dkt. No. 75, Attach. 12 ¶ 49.) Given his inability to be fitted for a face mask, Abboud was used in a support role on the Response Team if chemical agents were necessary. (Defs.' SMF ¶¶ 179-82.) Eventually, in 2014, Abboud was allowed to be fitted for a gas mask after signing a waiver regarding his inability to shave daily. (*Id.* ¶ 186.)

On April 10, 2013, Abboud filed a complaint with the NYSDHR regarding his omission from firearms qualifications, the shaving incident, CO Riposa's comments, his escort off the premises and placement on administrative leave, random gossip, the non-party Sergeant's comments

about drug sales, and being "singled out."  (Dkt. No. 75, Attach. 12 ¶ 50 (citing Dkt. No. 68, Attach. 6).)

On April 27, 2013, Abboud was observed crying and told Hawker that "his brain was making him cry" and that "his brain was moving around inside of his head."  (Defs.' SMF ¶ 194.)  Hawker directed another CO to drive Abboud home, and Abboud remained out of work until May 7, 2013 under a medical provider's direction.  (*Id* ¶¶ 195, 197.)  When he returned, Captain Tripoli and Michael Romeo, the Personnel Administrator, met with him to discuss what caused the April 27 incident and determine if it posed a future problem.  (*Id.* ¶ 198.)

The April 27, 2013 incident was one of a handful of similar incidents dating back to 2006, which defendants describe as including episodes of crying on the job, panic attacks, dizziness, and other physical and mental difficulties experienced by Abboud.  (*Id.* ¶ 206[13].)  Thus, Commissioner Cowin decided to obtain a medical examination[14] of Abboud to determine

---

[13] Abboud purports to deny this fact but merely argues that these episodes were not the reason that he was placed on restrictive duty—based on mostly conjecture—without ever denying that these episodes in fact occurred.  (Dkt. No. 75, Attach. 13 at 57-59.)  Thus, the fact is deemed admitted.

[14] Under certain circumstances, New York Civil Service Law § 72 allows an appointing authority to require an employee to undergo a medical examination to be conducted by a medical officer selected by the civil service department or municipal commission having jurisdiction.

his fitness for duty and decided that temporarily placing him on restricted duty, which would restrict his contact with inmates, was appropriate until an examination could be conducted.  (*Id.* ¶¶ 199, 203, 204, 207-08, 215.) On May 9, 2013, Sergeant Zabinski advised Abboud that he was being temporarily assigned to a position in rear control and should not have inmate contact.[15]  (*Id.* ¶ 214; Dkt. No. 75, Attach. 12 ¶ 55.)

On May 17, 2013, Abboud alleges he was "written-up yet again" for refusing overtime a week earlier.  (Dkt. No. 75, Attach. 12 ¶ 57A[16].) However, in reality, PAC recommended that he receive an oral warning based on his failure to provide documentation for the refusal of overtime on May 11, 2013, which was presented to him on May 17, 2013.  (Defs.' SMF ¶¶ 217-18.)  Abboud refutes the reason for this discipline because he claims that when he told Lieutenant Hawker that he was unavailable to work the overtime shift due to his father's hospitalization, he was ordered to write a memo, which he did, and was then relieved of the assignment and ordered to work a different overtime shift, which he did.  (Dkt. No. 75,

---

[15] Abboud previously testified at his deposition that it was Lieutenant Hawker who prohibited him from having inmate contact.  (Dkt. No. 68, Attach. 19 at 67-68.)  However, he provides no evidence of this.

[16] Abboud numbered two consecutive paragraphs as "57."  (Dkt. No. 75, Attach. 12 at 15.)  For clarity, the court refers to the first paragraph as "A" and the next as "B."

Attach. 12 ¶ 57A.)  In his opinion, this eliminated the need to submit the medical verification, as ordered, but he does not deny the fact that he disobeyed the order to submit such verification.  (Dkt. No. 75, Attach. 13 ¶ 217.)

On May 22, 2013, Abboud filed a second complaint with the NYSDHR involving his reassignment to rear control, restriction from inmate contact, and discipline for not providing a medical note.  (Dkt. No. 75, Attach. 12 ¶ 57B; Dkt. No. 68, Attach. 9.)

On June 14, 2013, Abboud responded to a lock-in call in inmate housing.  (Defs.' SMF ¶ 223.)  Given that this was a violation of his order to refrain from inmate contact, PAC recommended that Abboud receive a written reprimand, which he was issued on July 10, 2013.  (*Id.* ¶¶ 225-26.)

By letter dated July 15, 2013, Dr. Andrew Kaufman was appointed to conduct a medical examination of Abboud in order to determine his fitness to perform his duties.  (*Id.* ¶ 229.)

Abboud filed another NYSDHR complaint on August 12, 2013 alleging discrimination and retaliation based on his national origin and ethnicity when he was issued the July 10 written reprimand and ordered to undergo the medical examination.  (Dkt. No. 68, Attach. 12.)

The examination was conducted on August 15, 2013. (Defs.' SMF ¶ 232.) Dr. Kaufman found that Abboud "did not presently suffer from any disorder that would render him unable to perform his duties." (*Id.* ¶ 244.) As such, Abboud was notified that he was able to resume full duties. (*Id.*)

Abboud filed another NYSDHR complaint on September 18, 2013 claiming discrimination based on his national origin and ethnicity due to CO Riposa's negative comments in general and Lieutenant Hawker's response. (Dkt. No. 68, Attach. 15.) The NYSDHR and U.S. Equal Employment Opportunity Commission found no probable cause for any of Abboud's four complaints. (Defs.' SMF ¶ 247.)

Thereafter, he alleges that Captain Brush told him in front of other employees, "[y]ou're going to be walking on eggshells for the rest of your career." (Dkt. No. 68, Attach. 19 at 95; Dkt. No. 75, Attach. 12 ¶ 58.)[17]

## B.  Procedural History

On February 24, 2014, Abboud filed a complaint against the County, Cowin, Boyle, Blume, Hawker, Zabinski, Brush, Tripoli, Pritchard, Riposa, and John and Jane Doe(s). (Compl., Dkt. No. 1.) On August 27, 2014,

---

[17] Abboud goes on to describe additional "discriminatory and retaliatory actions" and "ethnically disparaging comments" that occurred after he filed the instant lawsuit. (Dkt. No. 75, Attach. 12 ¶¶ 59-65.) However, as discussed more fully in Part IV.E. below, these new allegations are not considered.

Abboud amended his complaint to add defendants Burnett and Brockway and asserted seventeen causes of action against various defendants. (Am. Compl.)  Specifically, against the County, Abboud asserts a Title VII claim based on national origin discrimination, (*id.* ¶¶ 43-45); a New York State Human Rights Law (NYSHRL) claim based on national origin discrimination,[18] (*id.* ¶¶ 46-48); a Title VII retaliation claim, (*id.* ¶¶ 76-78); and a NYSHRL retaliation claim, (*id.* ¶¶ 79-81).

Against Cowin, Blume, Hawker, Zabinski, Brush, Tripoli, Pritchard, Riposa, Burnett, Brockway, and Doe defendants, Abboud asserts a NYSHRL claim based on national origin discrimination, (*id.* ¶¶ 49-52); a Section 1983 claim for conspiracy to discriminate because of "national origin/ancestry," (*id.* ¶¶ 59-62); a Section 1985 claim for conspiracy to discriminate because of "national origin/ancestry," (*id.* ¶¶ 63-66); a NYSHRL retaliation claim, (*id.* ¶¶ 82-85); and a Section 1981 retaliation claim, (*id.* ¶¶ 86-88).

Against Cowin, Boyle, and Blume, Abboud asserts a claim pursuant to 42 U.S.C. § 1986 for failing to prevent a Section 1985 conspiracy.  (*Id.* ¶¶ 67-69.)

---

[18] *See* N.Y. Executive Law § 296.

Against the County, Cowin, Blume, Hawker, Zabinski, Brush, Tripoli, Pritchard, Riposa, and Doe defendants, Abboud asserts a claim under Article I, Section 11 of the New York State Constitution based on a violation of his right to equal protection because of "national origin/ancestry" discrimination.  (*Id.* ¶¶ 70-72.)

Against all defendants, Abboud asserts a Section 1981 claim based on employment discrimination because of his ancestry, (*id.* ¶¶ 53-55); a Section 1983 claim based on a violation of his rights under the Equal Protection Clause of the Fourteenth Amendment, (*id.* ¶¶ 56-58); a claim pursuant to New York Civil Rights Law Section 79-n based on an intentional selection for harm "because of a belief or perception regarding [his] national origin," (*id.* ¶¶ 73-75); a Section 1983 retaliation claim based on a violation of his rights under the First Amendment, (*id.* ¶¶ 89-91); a claim pursuant to Article I, Section 8 of the New York State Constitution for a violation of free speech, (*id.* ¶¶ 92-94); and a state common law negligence claim, (*id.* ¶¶ 95-98).

On March 22, 2017, defendants filed the pending motion for summary judgment.  (Dkt. No. 68.)

### III.  <u>Standard of Review</u>

The standard of review pursuant to Rule 56 of the Federal Rules of Civil Procedure is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

## IV. Discussion

### A. Statute of Limitations

Before addressing the merits of Abboud's claims, defendants "note" that his Title VII claims resting on allegations occurring prior to June 4, 2012, as well as his claims under Section 1983 and the NYSHRL resting on allegations occurring prior to February 24, 2011, are time barred. (Dkt. No. 68, Attach. 96 at 2-3.)

"Before an aggrieved party can assert a Title VII claim in federal court, he is generally required to . . . file a charge of discrimination with the EEOC within three hundred days after the alleged unlawful employment practice occurred . . . and must then file an action in federal court within 90 days of receiving a right-to-sue letter from the agency." *Duplan v. City of New York*, 888 F.3d 612, 621-22 (2d Cir. 2018) (internal quotation marks, footnote, and citations omitted). Claims under Section

1983 and the NYSHRL are generally subject to a three-year statute of limitations. *See Owens v. Okure*, 488 U.S. 235, 251 (1989) (applying three-year statute of limitations to Section 1983 claims); *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007) (applying three-year statute of limitations to NYSHRL claims). However, Section 1981 claims are subject to a four-year statute of limitations. *See Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 383 (2004); *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011); *Miller v. City of Ithaca*, No. 3:10–cv–597, 2010 WL 3809842, at *5 (N.D.N.Y. Sept. 22, 2010).

Abboud filed his first complaint with the NYSDHR on April 10, 2013. (Dkt. No. 75, Attach. 12 ¶ 50.) Although defendants appear to posit that June 4, 2012 is 300 days prior to April 10, 2013, the court calculates 300 days prior to April 10, 2013 as falling on or about June 15, 2012. In any event, Abboud's allegations regarding conduct occurring prior to June 2012 cannot provide a basis for his Title VII claims. Next, Abboud filed his complaint on February 24, 2014, (Compl.), and the earliest specific allegation of discrimination describes conduct that occurred on April 19, 2010, (Dkt. No. 75, Attach. 12 ¶ 14). Accordingly, claims under Section

1983 and the NYSHRL based on conduct occurring prior to February 24, 2011 are untimely—except for Abboud's claims under Section 1983 that involve violations of Section 1981, which may be based on conduct that occurred on or after February 24, 2010.

Abboud attempts to extend the statute of limitations period by arguing that "[d]efendants fail to acknowledge the applicability of the continuing violation doctrine." (Dkt. No. 76 at 3.) Indeed, the continuing violation doctrine, which acts to toll the otherwise applicable statute of limitations period, applies to claims "composed of a series of separate acts that collectively constitute one unlawful . . . practice." *Washington v. County of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004) (internal quotation marks and citation omitted). However, the doctrine does not apply "to discrete unlawful acts, even where those discrete acts are part of a serial violation," *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (internal quotation marks and citation omitted), and "is disfavored and will be applied only upon a showing of compelling circumstances." *Gonzalez v. N.Y. State Dep't of Corr. Servs. Fishkill Corr. Facility*, 122 F. Supp. 2d 335, 341 (N.D.N.Y. 2000) (citing *Findlay v. Reynolds Metals Co.*, 82 F. Supp. 2d 27, 37 (N.D.N.Y. 2000)). But, because hostile work environment

claims are "composed of a series of separate acts that collectively constitute one unlawful employment practice," *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (internal quotation marks and citation omitted), "a court may consider all of the acts that allegedly constitute the unlawful employment practice as long as at least one such act occurred within the [statute of limitations] period" and such acts are not "qualitatively different from one another," *Kimball v. Village of Painted Post*, No. 16-3264-cv, 2018 WL 2944337, at *1 (2d Cir. June 11, 2018) (internal quotation marks and citation omitted).

Abboud has failed to provide compelling reasons to extend the statute of limitations period for his discrimination or retaliation claims. Abboud's allegations involve various actors, unrelated comments, and—although it is often difficult to decipher—appear to be spread out temporally. As such, these untimely allegations may only serve as background evidence for Abboud's timely claims. *See Morgan*, 536 U.S. at 113 (noting that untimely prior acts of discrimination, although non-actionable, may serve as background evidence). However, because Abboud's hostile work environment clams are analyzed through a slightly different lens, his otherwise untimely allegations are saved by the

continuing violation doctrine because they comprise a sequence of events where Abboud allegedly experienced ethnically disparaging comments in the workplace for a prolonged period of time.

## B.    Claims Premised on National Origin Discrimination

Defendants argue that Abboud cannot establish a cause of action for national origin discrimination.  (Dkt. No. 68, Attach. 96 at 2-10.) "Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of discrimination."  *Chapotkat v. County of Rockland*, 605 F. App'x 24, 26 (2d Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  "If the plaintiff meets that initial burden, the burden shifts to the defendant to proffer some legitimate, nondiscriminatory reason for the challenged action." *Chapotkat*, 605 F. App'x at 26 (internal quotation marks and citation omitted).  "If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's explanation is pretext for discrimination."  *Id.* (internal citation omitted).

### 1.    Prima Facie Case

[T]o establish a claim of [national origin] . . . discrimination under

Title VII,[19] a claimant must show that: 1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.

*Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003).

### a.    Adverse Employment Action

Defendants argue that Abboud cannot establish that he suffered an adverse employment action because discriminatory comments, less desirable work assignments, and orders to rewrite a memo are not materially adverse employment actions.  (Dkt. No. 68, Attach. 96 at 4-5.) However, defendants stop short of arguing that all of Abboud's allegations do not constitute materially adverse employment actions.  (*Id.* at 5.) Abboud argues that his subjection to disciplinary actions, denial of firearms training which precluded him overtime and other assignments, and placement on restrictive duty constitute adverse employment actions.

---

[19] Although the court uses the "Title VII" label to analyze Abboud's discrimination claims, this analysis applies equally to all of his discrimination claims, unless otherwise stated.  *See Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause[.]"); *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177 (2d Cir. 1996) ("We consider [plaintiff]'s state law claims in tandem with her Title VII claims because New York courts rely on federal law when determining claims under the [NYSHRL].").

(Dkt. No. 76 at 5.)

"An adverse employment action is a materially adverse change in the terms and conditions of employment . . . [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Fairbrother v. Morrison*, 412 F.3d 39, 56 (2d Cir. 2005) (internal quotation marks and citations omitted), *abrogated on other grounds by Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199 (2d Cir. 2006). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (internal quotation marks and citation omitted). "Reprimands or negative evaluation letters may, in some circumstances, constitute adverse employment action . . . and whether they do is typically a question of fact for the jury[.]" *Lawrence v. Mehlman*, 389 F. App'x 54, 56 (2d Cir. 2010) (internal quotation marks and citations omitted).

First, Abboud's exemption from face mask fitting did not significantly impair his ability to participate in Response Team duties because the

limitation was short in duration, and the only change in his responsibilities was that he was used in a support role so as to avoid contact with chemical agents when they were necessary. (Defs.' SMF ¶¶ 179-182, 186.) Abboud fails to demonstrate that this was anything more than a "mere inconvenience or an alteration of job responsibilities." *Fairbrother*, 412 F.3d at 56. As for Abboud's temporary reassignment to a position in Rear Control and restriction from inmate contact, Abboud fails to provide any evidence to support a finding that this position included "significantly diminished material responsibilities." *Demoret*, 451 F.3d at 151. In fact, according to Abboud, "[t]he restricted duty assignment did not, nor could it, prevent inmate contact or contact with other officers." (Dkt. No. 75, Attach. 12 ¶ 56.) Finally, the October 27, 2012 incident involving Abboud's removal from the facility does not constitute an adverse employment action because it occurred during the end of his shift, he was paid for his time off, he was not disciplined, and when he arrived home he was told that he could return to work for his next regularly-scheduled shift.[20] (Defs.' SMF ¶¶ 133, 135, 139; Dkt. No. 75, Attach. 12 ¶ 34; *cf.*

---

[20] Abboud argues his claim based on this incident should survive because "there is a critical discrepancy in the evidence of a material fact." (Dkt. No. 76 at 8.) However, the discrepancy referenced, which relates to internal records of the October 17, 2012 incident, (*compare* Dkt. No. 68, Attach. 43 at 20-21, *with* Attach. 37 at 9), is not relied on by defendants and Abboud fails to demonstrate its

*Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) (holding that a paid suspension during an investigation into employee's wrongdoing is not an adverse employment action).)

However, a jury could reasonably conclude that the four written reprimands Abboud received between 2010 and 2013 constituted adverse employment actions. *See Lawrence*, 389 F. App'x at 56. Likewise, given that it is undisputed that Abboud's omission from the 2013 firearms qualifying list precluded him from working certain assignments, (Dkt. No. 75, Attach. 12 ¶ 46), and there is no evidence showing that such preclusion did not result in a material decrease in salary, *see Demoret*, 451 F.3d at 151, a jury could find that Abboud's omission from the 2013 firearms qualification list also constituted an adverse employment action.

### b.    Inference of Discrimination

Defendants argue that the circumstances surrounding Abboud's allegations of adverse employment actions do not give rise to an inference of discrimination. (Dkt. No. 68, Attach. 96 at 5-9.) However, these actions must be analyzed in the context of the steady course of discriminatory

---

materiality.

comments from co-workers and supervisors as well as the Department's failure to remedy such speech in the workplace. (*See generally* Part II.A.2.) Clearly, discriminatory comments may constitute evidence of discriminatory animus. *See Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 317 (N.D.N.Y. 2013). Accordingly, there are sufficient facts to give rise to an inference of discrimination.

### 2. Legitimate, Non-Discriminatory Reasons

Defendants offer legitimate, non-discriminatory reasons for issuing the April 19, 2010 written reprimand, (Dkt. No. 68, Attach. 96 at 12-13), the March 29, 2011 written reprimand, (*id.* at 13), the December 15, 2012 written reprimand, (*id.* at 14), and the July 10, 2013 written reprimand, (*id.* at 17-18).

However, defendants fail to provide a legitimate reason for Abboud's omission from the firearms qualification list. (*Id.* at 6). Although defendants rely on Lieutenant Hawker's testimony that he "[p]robably" used the list from the previous year, which Abboud was not on, (Dkt. No. 68, Attach. 30 at 49-50), Abboud has provided evidence that several employees were added to the 2013 list who were not on the previous

year's list, (Dkt. No. 75, Attach. 3).  Accordingly, there is a material question of fact regarding defendants' reason for omitting Abboud from the 2013 firearms qualifications list that precludes summary judgment.[21]

### 3.  Pretext

As for the claims based on written reprimands, the burden shifts back to Abboud to produce "evidence . . . show[ing] circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) (internal quotation marks and citation omitted).  Abboud "'is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the "motivating" factors.'"  *Edwards v. Khalil*, 12 Civ. 8442, 2016 WL 1312149, at *17 (S.D.N.Y. Mar. 31, 2016) (quoting *Cronin v. Aetna Life Ins. Co.*, 46

---

[21] There is no evidence in the record indicating that any of the Jamesville defendants, other than Lieutenant Hawker, were personally involved in omitting Abboud from the 2013 firearms qualifications list.  There being no evidence of their personal involvement in this adverse employment action, summary judgment dismissing the Section 1981 and Section 1983 claims against them is proper.  *See Patterson*, 375 F.3d at 229.  Additionally, Abboud's Title VII discrimination claims based on Lieutenant Hawker's conduct remain only against the County.  *See Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996) ("Congress did not intend to hold individual employees liable under Title VII").

F.3d 196, 203 (2d Cir. 1995)).

Generally, courts have recognized that stray or isolated remarks in the workplace without a demonstrated nexus to the challenged employment action will not defeat a summary judgment motion.  *See Veleanu v. Beth Israel Med. Ctr.*, No. 98 CIV. 7455, 2000 WL 1400965, at *5 (S.D.N.Y. Sept. 25, 2000) (collecting cases).  "Racist comments may constitute evidence of an intent to discriminate, but only if a sufficient nexus exists between the comments and the adverse employment action. . . . This connection exists if the comments were made by the decision-maker or by someone who had great influence over the decision-maker."  *Howe v. Town of Hempstead*, No. 04 Civ. 0656, 2006 WL 3095819, at *7 (E.D.N.Y. Oct. 30, 2006) (internal citation omitted).

Abboud relies primarily on the discriminatory comments allegedly made by CO Riposa, Lieutenant Hawker, and Captain Brush as evidence of pretext.  (Dkt. No. 76 at 6.)  On the same day that he was issued the first written reprimand, Abooud alleges that CO Riposa called him a "[s]tone thrower."  (Dkt. No. 75, Attach. 12 ¶ 14.)  Additionally, Abboud's July 10, 2013 written reprimand was issued nearly four months after CO Riposa's alleged statement that he "did not want minorities to progress."

(Dkt. No. 75, Attach. 12 ¶ 41.)  Despite this temporal proximity, there is no evidence that CO Riposa played any role in issuing written reprimands. (Defs.' SMF ¶¶ 54, 56, 59.)

In addition, the discriminatory comments allegedly made by Captain Brush about "you fucking Arabs blowing up shit" occurred more than four months before Abboud was issued the written reprimand on March 29, 2011.  (Defs.' SMF ¶ 97; Dkt. No. 68, Attach. 19 at 48-49; Dkt. No. 75, Attach. 12 ¶¶ 25, 32.)  There is no evidence that any additional discriminatory comments were made by anyone before Abboud was issued his next written reprimand on December 15, 2012.  *Cf. Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (finding that the temporal proximity must be "very close" and citing cases finding a fourth-month period between comments and an adverse employment action insufficient).  Although Captain Brush is a member of the committee responsible for reviewing reports of incidents involving employees and recommending discipline to the Commissioner, (Defs.' SMF ¶ 54), Abboud fails to point to any evidence demonstrating that Captain Brush wielded great influence over the committee, which is comprised of at least six other members.  (Dkt. No. 68, Attach. 49 at 2-3.)  Ultimately, it is the

Commissioner who determines whether issuing discipline is appropriate. (Defs.' SMF ¶¶ 56, 59.)  Notably, there are no allegations that Commissioner Cowin ever made any discriminatory comments.

As Abboud fails to offer sufficient evidence that could lead a reasonable juror to conclude that defendants' articulated rationale for subjecting him to written reprimands was a pretext for unlawful discrimination, these national origin discrimination claims are dismissed.

## C.    Retaliation

Abboud brings retaliation claims under: Title VII, (Am. Compl. ¶¶ 76-78); the NYSHRL, (*id.* ¶¶ 79-85); Section 1981, (*id.* ¶¶ 86-88); Section 1983, (*id.* ¶¶ 89-91), and Article I, Section 8 of the state constitution, (*id.* ¶¶ 92-94).  Specifically, Abboud alleges that defendants retaliated against him by issuing him written reprimands, disciplining him, counseling him, ordering him to attend a psychological examination, and making disparaging comments to him.  (Am. Compl. ¶¶ 37-41.)

All of Abboud's retaliation claims are evaluated under Title VII principles, which are governed by the familiar *McDonell Douglas*

burden-shifting analysis outlined above in Part IV.B.[22]  *See Hicks v.*

*Baines*, 593 F.3d 159, 164 (2d Cir. 2010).

> Title VII provides that:
>
> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Unlawful employment practices include

discrimination against any individual based on "race, color, religion, sex,

or national origin."  42 U.S.C. § 2000e-2(a)(1).

To avoid redundancy, the court assumes that Abboud has met his

initial, *de minimus* burden of showing "(1) participation in a protected

activity; (2) that the defendant knew of the protected activity; (3) an

adverse employment action; and (4) a causal connection between the

---

[22] "Courts analyze Title VII and First Amendment retaliation claims according to the same burden-shifting framework."  *Karam v. County of Rensselaer, New York*, 1:13-cv-01018, 2016 WL 51252, at *13 (N.D.N.Y. Jan. 4, 2016).  "[F]ree speech claims under Article 1, Section 8 of the New York State Constitution are subject to the same analysis as free speech claims under the First Amendment[.]"  *Id.* at *6 (internal quotation marks and citation omitted).  However, to succeed on a First Amendment retaliation claim, a plaintiff must also show that his speech was constitutionally protected.  *See Brunell v. Clinton County, New York*, 334 F. App'x 367, 370 (2d Cir. 2009).  Although the court is skeptical that this element is satisfied, defendants do not address whether Abboud's speech was constitutionally protected so as to constitute protected activity in the First Amendment context.  *See Karam*, 2016 WL 51252 at *7-9.  Therefore, the court assumes that Abboud has participated in a protected activity for these claims.

protected activity and the adverse employment action." *Hicks*, 593 F.3d at 164 (internal quotation marks and citations omitted). Notably, the standard for retaliation claims is broader in scope than that formerly applied to Abboud's discrimination claims. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) ("[I]n the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.' . . . This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII[.]")); *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." (internal quotation marks and citation omitted)).

The court is also satisfied that defendants have offered legitimate, non-discriminatory reasons for taking the adverse employment actions

previously addressed, *see supra* Part IV.B.2,[23] as well as the April 4, 2013 directive to rewrite a memo regarding shaving, (Dkt. No. 68, Attach. 96 at 5), the May 9, 2013 placement of Abboud on restrictive duty status, (*id.* at 15-16), the May 17, 2013 oral warning for refusing ordered overtime, (*id.* at 15), the order to undergo a medical examination, (*id.* at 15-17), the counseling that occurred in or about June 2013, (*id.* at 18), and defendants' calculation of Abboud's annual personal and sick leave accruals, (*id.* 18-19).[24]  *See Walsh*, 828 F.3d at 89 ("Title VII . . . is not an invitation for courts to sit as a super-personnel department that re-examines employer's judgments.") (internal quotation marks and citations omitted).

As such, the burden shifts back to Abboud to demonstrate that defendants' proffered reasons for taking the employment actions were merely pretextual.  *See Hicks*, 593 F.3d at 170.  However, unlike Abboud's discrimination claims,"Title VII retaliation claims must be proved

---

[23] Likewise, Abboud's retaliation claims based on his omission from the 2013 firearms qualification list survives for the reasons previously stated.  *See supra* Part IV.B.2.

[24] To the extent that Abboud argues that CO Riposa and Lieutenant Brush's alleged comments constituted retaliation, these statements may serve as evidence that other adverse employment actions were based on retaliatory animus, but they do not serve as adverse employment actions themselves. *See Hicks*, 593 F.3d at 165 ("Title VII does not set forth a general civility code for the American workplace.") (internal quotation marks and citation omitted).

according to traditional principles of but-for causation. . . .  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  "In order to establish but-for causation, [p]laintiff must prove that [an adverse employment action] would not have occurred in the absence of a retaliatory motive." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 231 (E.D.N.Y. 2014).  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).  The Second Circuit has cautioned that a determination involving pretext "is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact."  *Id.* at 846 n.5.

Ultimately, Abboud has not provided sufficient evidence to meet his burden for the majority of the employment actions taken.  First, he primarily relies on the close temporal proximity between his complaints

and subsequent reprimands.  (Dkt. No. 76 at 10-12.)  For instance, the only evidence he provides for the retaliatory motive behind the April 19, 2010 and March 29, 2011 written reprimands is that they followed close in time to his complaints.  (*Id.*)  And Abboud does not even bother discussing the July 10, 2013 written reprimand in his response.  (*Id.*)  Temporal proximity alone is insufficient to overcome an employer's legitimate, nondiscriminatory reason for an adverse employment action.  *See Simpson v. N.Y. State Dep't of Civil Servs.*, 166 F. App'x 499, 502 (2d Cir. 2006).

Additionally, the comment made by Lieutenant Burnett—who allegedly called him a "shit magnet" on October 24, 2010, (Dkt. No. 76 at 11)—is not evidence of the motivation behind his written reprimands because there is no evidence that Lieutenant Burnett was on PAC or influenced Commissioner Cowin in determining his discipline.  (Defs.' SMF ¶¶ 54, 56, 59.)

Regarding the December 15, 2012 written reprimand, the only evidence Abboud points to is Captain Brush's alleged statement about "walking on eggshells," which was made well over a year later.  (*Id.* at 12.)  Although Captain Brush was on PAC, as discussed previously there is no

evidence to demonstrate his level of influence over Commissioner Cowin, and, in any event, his comment was made in a different context and a long time after issuance of this written reprimand.

As for the May 17, 2013 oral warning, the only evidence upon which Abboud relies is that defendants were aware of his prior complaints filed a month earlier.  (Dkt. No. 76 at 12.)  Abboud also attempts to create an issue of material fact by arguing that there was no need for him to provide a medical note.  (*Id.*)  However, Abboud's disagreement with the order that he provide a medical note is not material.  *See Dorcely v. Wyandanch Union Free Sch. Dist.*, 665 F. Supp. 2d 178, 193 (E.D.N.Y. 2009) ("Federal courts do not have a roving commission to review business judgments . . . and may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions.") (internal quotation marks and citations omitted).  Abboud does not deny that he was given an order to provide a medical provider's note and failed to do so.  (Dkt. No. 75, Attach. 13 ¶ 217.)

However, there is sufficient evidence to permit a finder of fact to infer that defendants' proffered reasons for ordering Abboud to submit to a

medical evaluation and placing him on restrictive duty was pretextual. First, Abboud points to evidence that these actions followed shortly after his complaints. (Dkt. No. 76 at 13.) Next, he points out inconsistencies in defendants' proffered reasons for their actions. That is, the record demonstrates that "there were other incidents of . . . alleged bizarre behavior of [Abboud] in prior years, none of which singularly or together induced the Department to restrict [his] duty assignment or require him to attend a psychological evaluation." (*Id.* at 13.) Additionally, he maintains that he informed the Department that the April 27, 2013 incident was caused by a severe migraine, which was well-documented by his medical provider. (Dkt. No. 75, Attach. 12 ¶ 53.) Moreover, defendants' proffered rationale for placing Abboud on restrictive duty is undermined by the fact that the assignment did not prevent contact with inmates or other officers and also tasked him with securing and issuing firearms, ammunition, pepper spray, and batons. (Dkt. No. 76 at 13-14.) Given that this evidence undermines defendants' rationale, and defendants' do not address these contentions in their reply, a reasonable jury could determine that defendants' proffered rationale was mere pretext for retaliation. *See Zann Kwan*, 737 F.3d at 846 & n.5.

Accordingly, the only retaliation claims that survive are those based on Abboud's omission from the 2013 firearms qualification list, the order to submit to a medical examination, and placement on restrictive duty.[25]

## D.   <u>Hostile Work Environment</u>

In order to survive a summary judgment motion with respect to a hostile work environment claim, Abboud must provide sufficient evidence to create a genuine question of fact as to whether "[his] workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of [his] employment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).

> While there is no bright-line test as to the type of conduct that is required to give rise to a hostile work environment claim against an employer, we consider the following factors, which are not exclusive: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

---

[25] If an employment action was not discussed in the above section, it is because Abboud did not rebut any of the legitimate reasons offered by defendants in his response and defendants' motion in that regard is considered unopposed.  Furthermore, given that only Lieutenant Hawker was personally involved in Abboud's omission from the 2013 firearms qualification list, (Defs.' SMF ¶ 171-172; Dkt. No. 75, Attach. 12 ¶¶ 44-45), and only Commissioner Cowin was personally involved in the decision to place Abboud on restricted duty and to have him undergo a medical examination, (Defs.' SMF ¶¶ 203, 208), Abboud's Section 1981 and Section 1983 claims are dismissed against the remaining Jamesville defendants.  *See Patterson*, 375 F.3d at 229.  In addition, the court has carefully considered defendants' argument regarding municipal liability as it relates to Abboud's Section 1983 claims, (Dkt. No. 68, Attach. 96 at 27-28), but considers it to be unavailing because it is not sufficiently supported by the current record and hinges on factual issues best left for resolution by a jury.

mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Leifer v. N.Y. State Div. of Parole*, 391 F. App'x 32, 36 (2d Cir. 2010) (quoting *Harris*, 510 U.S. at 22-23).  As discussed above, Abboud's allegations that lack specificity—such that the court cannot determine if they are timely in the context of his other discrimination or retaliation claims—may serve as a foundation for his hostile work environment claims.  *See Kimball*, 2018 WL 2944337, at *1; *Morgan*, 536 U.S. at 117. Looking at the totality of the circumstances, rather than each individual event in isolation, a reasonable juror could conclude that Abboud's version of events is credible and the successive discriminatory comments directed at him (and the only other officer of Arab ancestry) had a sufficiently adverse effect on the conditions of Abboud's employment.  *See Leifer*, 391 F. App'x at 36 ("[T]he true test to determine whether an employee has been subjected to a hostile work environment is whether the harassment is of such a quality or quantity that a reasonable employee would find the conditions of [his] employment *altered for the worse*.") (internal quotation marks and citation omitted).  Ultimately, the workplace environment alleged to have been created—where the vast majority of employees and

superiors are white and repeatedly engage in ethnically-insensitive speech in front of others, which continues even after an employee has made his displeasure with such comments known—is the type of environment that "can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers, contrary to Title VII's broad rule of workplace equality." *Gregory v. Daly*, 243 F.3d 687, 693-94 (2d Cir. 2001) (internal quotation marks, footnote, and citation omitted), *abrogated in part on other grounds by Morgan*, 536 U.S. 101.

Defendants argue that, even if there is a question of fact regarding whether Abboud experienced a hostile work environment, he fails to establish that the conduct that created the hostile environment should be imputed to the employer. *See Gregory*, 243 F.3d at 692 n.3; *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998)*.*

Here, there is sufficient evidence to impute the conduct of the individuals behind the harassment to the County. First, because the discriminatory comments allegedly continued even after Abboud's complaints were made, (Dkt. No. 75, Attach. 12 ¶¶ 40-41, 46, 51, 58), reasonable jurors may disagree about whether the County's response was

adequate.  *Cf. Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000).  Additionally, as defendants concede, supervisors were allegedly involved in the harassment, and there is a presumption that their conduct is imputed to the employer.  (Dkt. No. 68, Attach. 96 at 25.) Although the evidence demonstrates that the County provided Abboud a reasonable avenue for making complaints and may have exercised reasonable care to respond to those complaints, (Dkt. No. 68, Attach. 96 at 25-26; Dkt. No. 77, Attach. 1 at 7), defendants fail to show that Abboud "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [the County] or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) ("When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages . . . compris[ing of] two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any [] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.")  Because both prongs are "necessary elements" of the *Burlington/Ellerth* affirmative defense, defendants cannot defeat Abboud's

hostile work environment claims simply by pointing to the existence of procedures addressing the harassment he allegedly experienced. *Id.* Alternatively, it is dubious whether the defense is available because there is a dispute over whether the harassment culminated in a tangible employment action. *See id.*

Accordingly, defendants' motion in this regard is denied, and Abboud's hostile work environment claims survive.[26]

## E.    All Other Claims

Given that Abboud presents no argument opposing summary judgment as to the majority of his state law claims, and because

---

[26] Although "most of the standards applicable to the conduct alleged to constitute hostile work environment in violation of Title VII are also applicable to [plaintiff]'s . . claims under § 1981 and his . . . claims under § 1983," there are some key differences. *Patterson*, 375 F.3d at 225-26. Notably, individuals may be held liable under Sections 1981 and 1983 for discriminatory acts giving rise to a hostile work environment if the discrimination was intentional. *See id.* at 226. Thus, Abboud's hostile work environment claims under Title VII remain only against the County and his hostile work environment claims under Section 1981 and Section 1983 remain against the Jamesville defendants in their individual capacities who were personally involved in discriminatory acts. Given that Abboud fails to adequately respond, (Dkt. No. 76 at 20), to defendants' arguments that they were not personally involved in the conduct establishing the remaining Section 1981 and Section 1983 claims, (Dkt. No. 68, Attach. 96 at 28-31), and because the record is devoid of any evidence that defendants Boyle, Blume, Tripoli, and Pritchard were personally involved in creating the hostile work environment described by Abboud, the claims against them are dismissed. *See Patterson*, 375 F.3d at 229. However, defendants' motion as it relates to the personal involvement of defendants Riposa, Hawker, Brush, Brockway, Zabinski, and Burnett is denied based on the record evidence of their personal involvement. (*See, e.g.*, Dkt. No. 68, Attach. 19 at 48-49, 95, 144, 151; Dkt. No. 75, Attach. 12 ¶¶ 10, 14, 23, 36, 41-42, 51.) Additionally, in an abundance of caution, the court does not dismiss these claims for lack of personal involvement against Cowin, given he "was responsible for overseeing all aspects of the [D]epartment, including enforcing the County['s] . . . equal employment opportunity policy" and "made the final decisions regarding policy within the Department." (Defs.' SMF ¶¶ 3-4); *see Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Furthermore, the claims against the Jamesville defendants in their official capacities are dismissed as redundant, given that the action is proceeding against the County. *See Baines v. Masiello*, 288 F. Supp. 2d 376, 384 (W.D.N.Y. 2003) (collecting cases).

defendants' arguments in favor of dismissal have facial merit, (Dkt. No. 68, Attach. 96 at 33-34), the court deems such claims abandoned. *See Boans v. Town of Cheektowaga*, 5 F. Supp. 3d 364, 375 (W.D.N.Y. 2014) (collecting cases). Although Abboud responds to defendants' motion as it relates to his NYSHRL claims, he concedes that the election of remedies doctrine bars the acts and omissions detailed within his NYSDHR complaints based on the Division's no probable cause determination. (Dkt. No. 76 at 20.) As such, these claims are dismissed. *See Whidbee*, 223 F.3d at 75-76.

Abboud's conspiracy claims are dismissed for the reasons stated by defendants, (Dkt. No. 68, Attach. 96 at 31-33), and without opposition by Abboud, (*see generally* Dkt. No. 76), who previously testified that the only evidence of a conspiracy was that all of the Jamesville defendants were friends, (Dkt. No. 68, Attach. 19 at 157-59).

In addition, Abboud's claims against the unidentified Doe defendants are dismissed without prejudice for the reasons stated by defendants and without opposition by Abboud. (Dkt. No. 68, Attach. 96 at 34); *see Delrosario v. City of New York*, No. 07 Civ. 2027, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010); *Keesh v. Artuz*, No. 97 Civ. 8417, 2008 WL

3166654, at *2 (S.D.N.Y. Aug. 6, 2008), *aff'd sub nom. Allah v. Michael*, 506 F. App'x 49 (2d Cir. 2012).

Furthermore, Abboud's attempt to use newly-asserted conduct, occurring after he filed his complaint, to support actionable claims is rejected.  (Dkt. No. 76 at 14-15.)  To the extent that those allegations are outside the pleadings, they are not considered.  *See Nagel v. County of Orange*, No. 09–CV–9960, 2013 WL 1285465, at *5 (S.D.N.Y. Mar. 28, 2013) ("[A] party may not raise new claims or theories of liability for the first time in opposition to summary judgment.").

## F.    Punitive Damages

Finally, defendants assert that punitive damages cannot lie against a municipality.  (Dkt. No. 68, Attach. 96 at 35 (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981)).)  Abboud does not object to this argument in his response.  (Dkt. No. 76 at 21.)  Accordingly, Abboud may not seek punitive damages against the County.  The remainder of defendants' motion as it pertains to this particular argument—regarding whether the Jamesville defendants acted recklessly—is denied with leave to renew in connection with trial.  As punitive damages are allowed for

First Amendment retaliation claims against municipal officers sued in their individual capacities, and such claims survive, summary judgment on this issue is inappropriate because "there [is] sufficient evidence to permit the factfinder to infer that the responsible official was motivated by malice or evil intent or that he acted with reckless or callous indifference to the federally protected rights of the plaintiff." *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 122 (2d Cir. 2006).

## V. <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 68) is **DENIED IN PART and GRANTED IN PART** as follows:

> **DENIED** with respect to (1) Abboud's discrimination claims pursuant to Title VII, Section 1981, and Section 1983 against Hawker and the County based only his omission from the 2013 firearms qualification list; (2) Abboud's hostile work environment claims against the County, Cowin, Riposa, Hawker, Brush, Brockway, Zabinski, and Burnett; and (3) Abboud's retaliation claims pursuant to Title VII, Section 1981,

and Section 1983, against the County, Cowin, and Hawker based only on his omission from the 2013 firearms qualification list, the medical examination, and restricted duty assignment; and

**GRANTED** in all other respects; and it is further

**ORDERED** that this case is now deemed trial-ready and a scheduling order will be issued in due course; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

September 27, 2018
Albany, New York

Gary L. Sharpe
U.S. District Judge